**C/M**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MICHAEL COBB,

Petitioner,

- against -

WILLIAM LEE,

Respondent.

**MEMORANDUM DECISION AND ORDER**

14-cv-2442 (BMC)

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief under 28 U.S.C. § 2254 from his 1993 conviction for second degree murder, first degree robbery, and second- and third-degree illegal weapon possession, for which he was sentenced as a second violent felony offender to an aggregate of 41 years to life in prison. The facts will be set forth below where necessary to address petitioner's points of error, but to summarize, petitioner and two accomplices, all of whom were armed, approached a parked car in Brooklyn occupied by four young men, at least two of whom, Jerry Neal and Billy Williams, were drug dealers. Petitioner and one of his accomplices forced one of the young men, John Calloway, out of the car at gunpoint while another of the accomplices briefly stayed with the car before following the others, and, after escorting Calloway to a nearby house or housing project, petitioner shot Calloway twice in the head, killing him. There were no eyewitnesses at trial who saw the shot being fired, but Neal and Williams identified petitioner as one of the three assailants that forced Calloway out of the car, and Neal testified that he heard shots fired promptly thereafter. When police arrested petitioner a week later, he was carrying a

9mm Glock, the ballistics of which matched the bullets extracted from Calloway's head and a shell casing found at the scene of the murder. The autopsy showed that Calloway had been shot at close range.

Petitioner's habeas corpus petition reprises multiple claims of error that he raised on direct appeal in both represented and *pro se* briefs, and in two motions to vacate his conviction under N.Y. C.P.L. § 440.10. The District Attorney asserts that the present petition is untimely, and that, in any event, it is a second or successive petition under 28 U.S.C. § 2244(b) and thus requires permission to proceed from the Court of Appeals.[1] I reject the timeliness and successive petition arguments, but I hold that petitioner's claims are insufficient to warrant relief under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. The petition is therefore denied.

**I. Timeliness**

Section 2244(d)(1) of AEDPA provides, *inter alia*, that a habeas corpus petition must be brought within one year of the date on which a petitioner's state court conviction becomes "final." 28 U.S.C. § 2244(d)(1). Under that provision, the one-year limitations period is tolled while "a properly filed application for State post-conviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d)(2). The District Attorney argues that the petition is barred by the one-year limitations period.

The District Attorney's argument that the instant petition is untimely miscalculates the date on which petitioner's conviction became final. He also misapplies a statutory toll.

[1] At my direction, the parties have briefed the limitations and successive petition issues. Pursuant to Rule 5(a) of Rules Governing Section 2254 and Section 2555 Proceedings, I have not ordered respondent to submit additional briefing because the record itself is sufficient to address petitioner's arguments.

The District Attorney assumes that petitioner's conviction became final 90 days after the New York Court of Appeals denied leave to appeal petitioner's conviction. See People v. Cobb, 15 N.Y.3d 952, 917 N.Y.S.2d 112 (2010) (table) (denying leave to appeal conviction on December 3, 2010). On this view, the conviction became final on March 3, 2011. But the record confirms, as petitioner notes, that he filed a motion for reconsideration of the denial of leave to appeal his conviction, and he therefore asserts that the conviction didn't become final until 90 days after that motion was denied. See People v. Cobb, 16 N.Y.3d 894, 926 N.Y.S.2d 29 (2011) (table) (denying reconsideration on May 25, 2011).

Petitioner is right. See Hizbullahankhamon v. Walker, 255 F.3d 65, 68 (2d Cir. 2001) (starting the 90-day period on the date the New York Court of Appeals denied a motion for reconsideration); Rosa v. Walker, No. 00-cv-2059, 2002 WL 1467737, at *2 (E.D.N.Y. May 10, 2002) (same); see also Miller v. Pallito, No. 13-cv-211, 2014 WL 1203034, at *5 (D. Vt. Mar. 24, 2014) ( "under the applicable United States Supreme Court Rules at the time . . . the time to [petition for a writ of certiorari] expired not more than 90 days after the Vermont Supreme Court denied reargument"). Thus, the conviction became final on August 23, 2011. That would mean petitioner had until August 23, 2012 to file his federal habeas petition. He did not do so until April 14, 2014. The question, then, is whether petitioner can avail himself of statutory tolling.

Petitioner brought two motions to vacate his conviction under N.Y. C.P.L. § 440.10. The first did not toll the one-year period, as it was disposed of prior to petitioner's conviction becoming final. The second, however, was filed after petitioner's conviction became final, so it could effect a toll.

That second motion was filed on February 24, 2012. It stopped the clock with 181 days left in AEDPA's one-year limitations period. Since the District Attorney does not contest that

this second § 440 motion was "properly filed," it would toll the limitations period as long as it remained "pending." See 28 U.S.C. § 2244(d)(2).

A motion "is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." Bennett v. Artuz, 199 F.3d 116, 120 (2d Cir. 1999), aff'd, 531 U.S. 4 (2000). In turn, "a timely appeal tolls AEDPA's 1-year limitations period for the time between the lower court's adverse decision and the filing of a notice of appeal in the higher court." Evans v. Chavis, 546 U.S. 189, 197 (2006).

This is where the District Attorney makes a wrong assumption. He assumes that to timely appeal a motion court's denial of a § 440 motion, a petitioner must seek leave to appeal from the Appellate Division within 30 days of the entry of the order denying the § 440 motion. However, the starting date is not 30 days from the entry of the order; it is 30 days "after service upon [the petitioner] of a copy of the order sought to be appealed." N.Y. Crim. Proc. Law § 460.10(4)(a); see also N.Y. Crim. Proc. Law §§ 450.15(1)-(2), 460.15; Alke v. Artus, No. 15-cv-2677, 2016 WL 4186965, at *3 (E.D.N.Y. Aug. 8, 2016).

The motions court denied petitioner's second § 440 motion on September 13, 2012, but petitioner did not receive the order until September 20, 2012. That means petitioner had 30 days from September 20 – i.e., until October 20 – to seek leave to appeal. See Alke, 2016 WL 4186965, at *3. Petitioner acted within that period, as he sought leave to appeal on October 17, 2012. If a petitioner timely seeks leave to appeal the denial of a § 440 motion, the "§ 440 motion tolls the limitations period until the Appellate Division either decides the motion on appeal or denies an application for leave to appeal from the denial of the motion." Doyle v. Yelich, No. 05-cv-2750, 2005 WL 2475727, at *1 (E.D.N.Y. Oct. 7, 2005) (citing Carey v. Saffold, 536 U.S. 214 (2002)).

The Appellate Division denied leave to appeal on December 13, 2012. At that point, the toll ended, and petitioner had 181 days to file his federal habeas petition. He waited another two years. Thus, petitioner needed another motion to effect another toll.

There is a second motion: petitioner's "combined motion for leave to reargue and renew" the denial of his second § 440 motion. If that motion (the "Combined Motion") was "properly filed" under AEDPA, it too would toll the statute of limitations while it was "pending." See 28 U.S.C. § 2244(d)(2). "[A]n application is 'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." Artuz v. Bennett, 531 U.S. 4, 8 (2000). "[T]ime limits, no matter their form, are 'filing' conditions." Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005). Thus, a postconviction motion is not "properly filed" under AEDPA when it "is untimely under state law." Id. at 414. And under New York law, a "motion for leave to renew or to reargue a prior motion" in a motion court must "be made within thirty days after service of a copy of the order determining the prior motion and written notice of its entry." N.Y. C.P.L.R. § 2221(d)(3).

The 30-day period began on September 20, 2012, when petitioner received the order denying his second § 440 motion. The period would have ended on October 20. But once again, petitioner acted within that period, as he filed the Combined Motion on October 15. That means the Combined Motion was "properly filed" within the meaning of AEDPA, and the statute of limitations was tolled while it was "pending." See Smalls v. Smith, No. 05-cv-5182, 2009 WL 2902516, at *8 (S.D.N.Y. Sept. 10, 2009); Bradley v. LaClair, 599 F. Supp. 2d 395, 404 (W.D.N.Y. 2009).

The Combined Motion ceased to be "pending" when it was denied on February 28, 2014. At that point, petitioner had another 181 days to file his federal habeas petition. That would give

him until August 28, 2014. Since he filed his habeas petition on April 14, 2014, the petition is timely.

## II. Second or Successive Petition

Petitioner first sought habeas corpus relief in 2005, when he filed a limited petition seeking to reinstate the direct appeal of his conviction, which the Appellate Division had dismissed as abandoned. Judge Dearie granted that petition in 2008, ordering restoration of petitioner's appeal to the Appellate Division. Cobbs v. Ricks, No. 05-cv-3019, 2008 WL 2156752 (E.D.N.Y. May 22, 2008).

The District Attorney argues that under 28 U.S.C. § 2244(b)(2), the current petition is "second or successive." If it is, this Court has no jurisdiction to consider it, and must transfer it to the Court of Appeals for its determination of whether petitioner should be granted leave to file a second or successive petition. See Poindexter v. Nash, 333 F.3d 372, 382 (2d Cir. 2003).

I agree with petitioner that the pending petition is not second or successive, even though it addresses the same conviction as his first petition, because the first petition never sought to invalidate that conviction or sentence. Instead, petitioner only sought to allow reinstatement of his direct appeal in state court. It would be anomalous if, having prevailed in that petition, petitioner thereby forfeited his right to federal habeas review of the claims that he had sought all along to exhaust in state court. The law does not admit to that anomaly. See Urinyi v. United States, 607 F.3d 2010 (2d Cir. 2010) ("Urinyi did not contend [in his first petition] that his sentence had been illegally imposed; he sought only reinstatement of his right to a direct appeal", and, therefore, his subsequent petition was not second or successive); United States v. Chen, No. 03-cr-567, 2011 WL 5865732, at *3 (S.D.N.Y. Nov. 22, 2011) (Chin, Circuit Judge, by designation) ("a petition is not 'second or successive' where a court, in deciding a § 2255

motion, merely reinstates the defendant's right to file a direct appeal"); cf. Whab v. United States, 408 F.3d 116, 118 (2d Cir. 2005) ("We have previously explained that for a subsequent petition to be considered 'second or successive,' bringing into play AEDPA's gatekeeping provisions, the disposition of an earlier petition must qualify as an adjudication on the merits.").

## III. Claims raised in represented brief on direct appeal

Because the Appellate Division rejected each of petitioner's claims on direct appeal on the merits, this Court's review attracts the provisions of AEDPA.[2] AEDPA permits reversal not simply because the habeas court, or even a Court of Appeals, has found a constitutional violation in analogous circumstances. Rather, only if a state court's legal conclusion is "contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States* . . . ", 28 U.S.C. § 2254(d)(1) (emphasis added), is habeas relief appropriate.

The decision of a state court is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature," or "mutually opposed" to the relevant Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision involves "an unreasonable application" of clearly established federal law if the state court applies federal law to the facts of the case "in an objectively unreasonable manner." Brown v. Payton, 544 U.S. 133, 141 (2005).

[2] Of the six claims in petitioner's represented brief on direct appeal, the Appellate Division held that three were unpreserved and without merit, and the other three were without merit. Since I have concluded that the Appellate Division's ruling on the merits of the claims must be upheld under the deferential review standard of AEDPA, I need not consider the Appellate Division's procedural bar rulings. See Van Buskirk v. Baldwin, 265 F.3d 1080, 1083 (9th Cir. 2001) (Court may properly deny petition on merits rather than reaching "the complex questions lurking in the time bar of the AEDPA."); cf. 28 U.S.C. § 2254(b)(2) (application for writ of habeas corpus may be denied on merits, notwithstanding failure to exhaust state remedies). This Court will follow that procedure as to all of petitioner's subsequent challenges to his conviction, as the state courts in each instance rejected his claims on the merits and some of them as procedurally barred as well.

The Supreme Court has made clear that the AEDPA standard of review is extremely narrow, and is intended only as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal . . . ." Ryan v. Gonzales, 568 U.S. 57, 75 (2013) (cleaned up). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 88 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has repeatedly admonished lower courts for not affording sufficient deference to state court determinations of constitutional issues. See, e.g., White v. Wheeler, 577 U.S. 73 (2015) ("This Court, time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" (quoting Burt v. Titlow, 571 U.S. 12, 19, (2013)).

**A. Failure to swear venire**

The transcript of jury selection does not expressly disclose whether the venire was sworn before voir dire (although it does disclose that the jury, once selected, was sworn). On direct appeal, petitioner contended that the venire had not been sworn; that this failure violated both his statutory and due process rights; and to the extent that this claim was unpreserved, trial counsel was ineffective. The District Attorney responded by disputing petitioner's assertion that the venire had not been sworn, pointing to circumstantial evidence in the transcript that it had; that the claim was unpreserved because petitioner's trial counsel had not objected at trial; and that the failure to object was not ineffective assistance. The Appellate Division held, *inter alia*, that

"contrary to the defendant's contention, that oath was administered." Cobb, 77 A.D.3d at 673, 908 N.Y.S.2d at 448-49.

Because the Appellate Division made a factual finding that the oath had been administered, this Court's review is constrained by 28 U.S.C. § 2254(e)(1). That subsection of AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. Here, the transcript discloses that on the second day of jury selection, before any jurors had been chosen to sit, a prospective juror started to preface an answer to a question by saying: "[t]o be perfectly honest . . .", but the trial court cut off the juror by responding: "I hope so. *You were sworn yesterday.*" (Emphasis added). It would have made no sense for the trial court to have said that if the venire had not been sworn.

It was thus perfectly reasonable for the Appellate Division to infer from this statement that although the oath of the venire did not appear in the transcript, it had in fact been given. For purposes of federal habeas corpus review, petitioner has not met his burden of showing error by any standard of proof, let alone by clear and convincing evidence.

**B. Batson challenge**

In the first round of jury selection, the prosecutor struck four prospective jurors, two of whom were white and two of whom were black. In the second round, the prosecutor exercised two peremptory challenges, both against black women. In the third round, of the first four jurors to be considered, the prosecutor struck two who were black. At that point, petitioner's counsel stated, "I would suggest to the Court that most of the People's challenges have been [to] black or Hispanic people." The trial court overruled the objection.

Petitioner asserted to the Appellate Division, and reasserts here, that the trial court erroneously found that he had not made out a *prima facie* case of racial motivation in the prosecution's exercise of peremptory challenges against black jurors, and that, based on that ruling, the trial court declined to have the prosecutor explain why he struck those jurors. His argument was based solely on the fact that out of the prosecution's first eight challenges, six had been used against blacks. The Appellate Division rejected the argument, holding:

> A disproportionate number of challenges to prospective jurors who are members of a particular racial or ethnic group, without more, is rarely dispositive on the issue of an impermissible discriminatory motive. In the absence of a record demonstrating other circumstances supporting a *prima facie* showing, the Supreme Court correctly found that the defendant failed to establish a pattern of purposeful exclusion sufficient to raise an inference of racial discrimination.

People v. Cobb, 77 A.D.3d 673, 908 N.Y.S.2d 448 (2010) (cleaned up), leave to app. denied, 15 N.Y.3d 952, 917 N.Y.S.2d 112 (2010).

It is certainly possible that racial disproportionality in the exercise of peremptory challenges satisfies Batson's *prima facie* standard, but it doesn't do so automatically, especially if there are other circumstances of which the trial court is aware that contradict the suggestion of racial motivation. See Carmichael v. Chappius, 848 F.3d 536 (2d Cir. 2017); Jones v. West, 555 F.3d 90 (2d Cir. 2009); Overton v. Newton, 295 F.3d 270 (2d Cir. 2002). Here, there were plenty of reasons known to the trial court that weighed heavily against an inference of racial discrimination, some of which it noted in denying petitioner's Batson motion, and others that are inescapable from the prospective jurors' answers to questions during *voir dire*.

Beyond that, the trial court observed that in round one, the prosecution had used peremptories against two white women as well as two black women. It also noted that in round two, the prosecution had used peremptories against only two out of fifteen prospective jurors, and had accepted a black woman and a black man, and in round three, had accepted two black

women. The trial court further noted that there were a "fair amount of blacks to whites." That is a relevant consideration in Kings County. It recognizes that the borough is extremely diverse, and it would be overwhelmingly difficult and obvious to systemically exclude black jurors. Indeed, petitioner and the District Attorney agreed on direct appeal that out of the first ten jurors seated, five were African-Americans.

Beyond the trial court's observations, there was a lot more information in the prospective jurors' answers to questions. Most of the prospective black jurors that the prosecution peremptorily challenged were individuals that many prosecutors would be unlikely to seat if they had a say about it for reasons having nothing to do with race. One had a brother who had been convicted of drug offenses and served time, and at the time of selection, was serving more time for child abuse, and two of that prospective juror's uncles had arrest records. Another of the prospective black jurors had a family member facing a gun charge in a drug-related case. The prosecution had to consider these prospective jurors' family history in the criminal justice system in light of the fact that two of the prosecution's witnesses at trial would be drug dealers (surviving occupants of the car) who had never been punished. The trial court could reasonably conclude that the prosecutor could not be faulted for not wanting to take a chance on which way those family histories would cut.

Another of the prospective black jurors was very confused; she first responded that she had served on a criminal jury twice before, but when asked what the charges were, she initially didn't remember, then said it was arson but the jury did not reach a verdict, and then she stated that in fact she had not sat on a jury and heard evidence. Another prospective black juror had been stopped without probable cause by the police based on a "description" of a suspect; and said he had been stopped a different time by a "rookie cop" and asked what was in his pocket

because someone down the street was selling drugs. In addition, his house had been burglarized but the police had never apprehended the perpetrator.

These four jurors are the easiest to identify out of the six, but there were also facially legitimate reasons for challenging the other two as well. And, of course, the trial court, having presided over selection, knew all this information. In concluding that Batson and its Supreme Court progeny did not require a finding of a *prima facie* showing based solely on the ratio of black challenges to white challenges, the Appellate Division's decision was neither contrary to nor an unreasonable application of those cases.

That is not to say that the trial court could not have, or even should not have, come out differently. Many judges use a ratio or absolute number alone as a reason to find a *prima facie* showing, allowing a fuller record to be developed by having the prosecutor state his reasons for the challenges of minority jurors. But as the Second Circuit has observed:

> Had we been presiding over jury selection in Carmichael's case in the first instance, we might very well have concluded that Carmichael made out a *prima facie* showing of race discrimination. However, as we have had occasion to observe before, the fact that numerical evidence may have permitted an inference of discrimination does not establish that a contrary conclusion must be an unreasonable application of Batson and its progeny. The AEDPA establishes a highly deferential standard for evaluating state-court rulings: a state court's error must be beyond any possibility for fairminded disagreement if it is to warrant reversal on a habeas petition in federal court. Deference to state courts is especially important when reviewing habeas claims predicated on a violation of the first step of the Batson framework because Batson and its progeny provide state courts with limited guidance on what constitutes a *prima facie* case of discrimination.

Carmichael, 848 F.3d at 548–49 (cleaned up).

**C. Petitioner's absence during voir dire**

Petitioner contended on direct appeal that he was unconstitutionally deprived of his right to be present during voir dire because the parties' challenges were exercised in chambers without

petitioner being present. However, he had signed a waiver of the right to be present during bench conferences, and the Appellate Division found he had an opportunity to discuss the challenges with his lawyer. It held that

> the defendant does not dispute that his waiver of his right to be present during sidebar discussions with prospective jurors was knowing, voluntary, and intelligent, nor that he waived his right to be present when challenges were made in the robing room regarding prospective jurors, nor that he was present during the voir dire of the jurors, and the record belies the defendant's contention that he did not have an opportunity to discuss the challenges before they were made. Contrary to the defendant's contention, the challenges were given effect in his presence when the accepted jurors were sworn in open court.

Cobb, 77 A.D.3d at 673–74, 908 N.Y.S.2d at 449 (cleaned up).

Under federal law, a criminal defendant "has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." Faretta v. California, 422 U.S. 806, 819 n. 15 (1975). Although "the empaneling of a jury is a material stage of a trial that requires the defendant's presence", Diaz v. Herbert, 317 F. Supp. 2d 462, 473 (S.D.N.Y. 2004) (citing Norde v. Keane, 294 F.3d 401, 411 (2d Cir. 2002)), "the right to be present is not absolute: it is triggered only when the defendant's 'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" Cohen v. Senkowski, 290 F.3d 485, 489 (2d Cir. 2002) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934)).

Accordingly, "there is not now and never has been a right guaranteed in the federal Constitution that a defendant be present at sidebar voir dire." Zaire v. Mitchell, No. 93-cv-6626, 1996 WL 82391, at *3 (S.D.N.Y. Feb. 27, 1996). As the Second Circuit has held, "when a defendant is fully apprised of the nature of the pre-screening procedure, makes no objection to the procedure, and has counsel present for the duration of the pre-screening, a knowing waiver of the right to be present occurs." Cohen, 290 F.3d at 492; see also Tankleff v. Senkowski, 135

F.3d 235, 237 (2d Cir. 1988) (finding that waiver of defendant's right to be present during a particular stage of voir dire could "properly be inferred from the conduct of the defendant and his attorneys"); cf. United States v. Gagnon, 470 U.S. 522, 529 (1985) (per curiam) ("respondents' total failure to assert their rights to attend the conference with the juror sufficed to waive their rights" to be present under Federal Rule of Criminal Procedure 43).

Applying these standards and the presumption of correctness as to the Appellate Division's factual finding that petitioner had "an opportunity to discuss the challenges before they were made," the Appellate Division's rejection of his argument was neither contrary to nor an unreasonable application of any Supreme Court decision. Any additional right petitioner may have had was waived, both expressly and by petitioner's conduct.

**D. Erroneous jury charge**

Petitioner contended he was deprived of due process on the robbery count of his conviction because of a defect in the jury instructions. The evidence showed that when petitioner and an accomplice escorted Calloway away from the car, the other accomplice took the keys from the driver at gunpoint. That was the robbery. The trial court charged the jury:

> The second element of this crime of robbery is that the defendant, while acting in concert with others, stole the property with the intent to deprive another of it. According to the law, a person acts with the intent to deprive another of it, when his conscious aim or objective so [sic] deprive another of the property.

Petitioner's argument is that the trial judge should have told the jury that, under New York law, "deprive" means to permanently deprive, not temporarily deprive. Apparently, his theory was that the jury might have found that the intent in taking the keys was only to hold them long enough to kill Calloway. The Appellate Division held that "inasmuch as there is no reasonable view of the evidence under which the defendant did not intend to permanently deprive the

complainant of the property, the defendant's challenge to the court's charge as given is without merit." Cobb, 77 A.D.3d at 674, 908 N.Y.S.2d at 449 (quotation omitted).

It has often been noted that a habeas petitioner faces "an 'especially heavy' burden" in "seek[ing] to show constitutional error from a jury instruction that quotes a state statute." Waddington v. Sarasud, 555 U.S. 179, 190–91 (2009) (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)); see also DelValle v. Armstrong, 306 F.3d 1197, 1200-01 (2d Cir. 2002); Hobson v. Wendlend, No. 11-cv-3225, 2017 WL 4675764 at *8 (E.D.N.Y. Oct. 13, 2017). The Second Circuit has "repeatedly held that '[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.'" Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (alteration in original) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)). In other words, "the [petitioner] must show both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington, 555 U.S. at 191 (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)). "Because it is not enough that there is some slight possibility that the jury misapplied the instruction, the pertinent question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Moronta v. Griffen, 610 F. App'x 78, 79 (2d Cir. 2015) (quoting Waddington, 555 U.S. at 191).

The Appellate Division's fact-based finding that the evidence would not support a finding of an intent to temporarily deprive the car's driver of the keys dooms petitioner's claim. As to the first factor, only if the Appellate Division's decision was wholly contrary to the evidence

could I find a misapplication of New York law. That is not the case; indeed, I do not see how the jury could reasonably have found that petitioner and his accomplices intended to give back the keys at the time they took them. As to the second factor, a due process violation, there would be no impediment to a state law that punished robbery even if it was based on an intent to obtain a temporary deprivation of property. Petitioner's argument therefore does not present a due process issue.

**E. Trial court's handling of jury notes**

Petitioner argued on direct appeal that the trial court had failed to give trial counsel notice and an opportunity to be heard as to requested read-backs of testimony from two witnesses. He claimed that this violated his statutory and due process rights. The Appellate Division described this argument as petitioner's "remaining contention in defendant's main brief," as it had expressly addressed all the others in its decision, and held that the argument was unpreserved and, in any event, without merit. Cobb, 77 A.D.3d at 674, 908 N.Y.S.2d at 449. My review of the Appellate Division's decision on the merits is therefore subject to the deferential standard of AEDPA described above.

This was another instance where the trial court and the parties did something off the record but all indications are that the off the record proceedings conclusively contradict the factual basis of petitioner's argument. Because there was no colloquy discussing how to dispose of the first two read-back requests, but there was colloquy as to the rest, petitioner assumes that the trial court acted on those notes without consulting the parties. The record and common sense belie that.

First, we know the trial court's procedure in dealing with read-back requests because it appears on the record regarding a different request – the third, final read-back request that the

jury made. Before that read-back, defense counsel stated, "The district attorney and I, while you were handling the calendar, had an opportunity to review the record, and we have decided which portion should be read." That portion was then read. Therefore, we know that the trial court let the parties select the read-back portions that were responsive to jury requests.

There is no reason to think the trial court did anything differently with the first two notes requesting read-backs. That is especially the case because the first two notes about which petitioner is complaining did not request a read back of any witness's entire testimony; rather, they asked for topical portions from the testimony of two witnesses. To exclude the parties from input into that determination (again, contrary to what we know the trial court did with respect to the final request for a read-back), means the trial judge would have had to sit down with the court reporter in private, have her read all the testimony from each witness to him, and then himself select the portions that he thought were responsive to the notes. That is not a task that trial judges typically, if ever, take upon themselves. The almost universal procedure is that which we know the trial judge followed with respect to the third note, that is, tell the lawyers to try to agree on the portions which the jury is requesting, and then present those portions to the jury. The fact that the direction to the lawyers is not on the record does not warrant an inference of a constitutional violation.

Finally, the record discloses that after the trial court provided the read-backs requested by the jury in the first two notes, petitioner's counsel implicitly approved the way the notes had been handled. After the read-back for the first two notes, before court adjourned for the day, the trial court asked petitioner's counsel if petitioner had anything to bring to the court's attention. Counsel replied: "I have no application, no motions, no objections." The same thing happened the next morning. I am not pointing to the effect of these events on the Appellate Division's

invocation of a procedural bar, but, rather, as further circumstantial evidence that, in fact, the lawyers had agreed on which portions of testimony to read back to the jury.

Nothing in the Appellate Division's decision on this point comes close to being contrary to or an unreasonable application of any Supreme Court decision.

### F. Excessive sentence

Petitioner asked the Appellate Division to exercise its discretion to reduce his sentence by making the sentences on each count run concurrently instead of consecutively. There is no "constitutionally cognizable right to concurrent, rather than consecutive, sentences." United States v. McLean, 287 F.3d 127, 136 (2d Cir. 2002) (quoting United States v. White, 240 F.3d 127, 135 (2d Cir. 2001)). "Whether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review." Johnson v. New York, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012) (citations omitted).

Petitioner has not argued and cannot argue that the sentence imposed exceeds the level authorized by state law. The argument therefore presents no federal constitutional issue unless the sentence shocks the conscience. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."). There is nothing shocking to the conscience about 41 years to life for a cold-blooded assassination.

## IV. Claims raised in petitioner's *pro se* brief on direct appeal

Petitioner raised eight claims alleging ineffective assistance by his retained trial counsel, George Sheinberg, Esq., in his *pro se* brief, and there were other points subsumed within those or asserted in the statement of facts. The Appellate Division rejected all these arguments on the merits summarily, except for one claim it specifically addressed and also rejected on the merits.

This means that my review of the Appellate Division's decision is subject to the deferential standard of AEDPA discussed above.

That makes petitioner's burden doubly difficult because the standard for ineffective assistance of trial counsel is itself very narrow. See Harrington, 562 U.S. at 105. To establish a claim of ineffective assistance of counsel, petitioner must show that: (1) counsel's performance was deficient and (2) petitioner suffered prejudice as a result of the deficient performance. Strickland v. Washington, 466 U.S. 668, 687–88 (1984). Counsel's performance must fall "below an objective standard of reasonableness" to be deficient. Id. Specifically, counsel's conduct must have "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result." Id. at 686. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," and that counsel's actions were part of a "sound trial strategy." Id. at 689–90. A court should "assess counsel's overall performance throughout the case" when evaluating a claim of ineffective assistance. Kimmelman v. Morrison, 477 U.S. 365, 386 (1986).

To establish prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Reasonable probability is "[a] probability sufficient to undermine confidence in the outcome." Id.

**A. Points relating to the identification at the suppression hearing**

Petitioner first asserted that his counsel should have objected to the testimony of a police detective at the suppression hearing. The first detective to testify, Ricky Ferguson, had spoken to two witnesses who he identified by number – Witnesses 1 and 2 – but not by name. The hearing

court permitted this, noting that there was a concern that the witnesses might recant if they were publicly identified. In fact, Det. Ferguson testified that Witness 2 had resisted coming to the precinct to make an identification out of fear for his safety. Witnesses 1 and 2, who the detective interviewed separately, told the detective that they had known petitioner for 5–6 years and since childhood, respectively. Both also told the detective that they had seen petitioner force Calloway out of the car at gunpoint and take him to the address where his body was later found. After telling the detective that they knew petitioner and that he was the one who took Calloway out of the car, both witnesses, without communicating with each other, separately picked petitioner out of a photo array.

A second detective, Richard Sullivan, testified that about four days after the murder, he had spoken to a third witness named Rolando Quinones. Quinones told Det. Sullivan that he had seen petitioner, who he had known for about a year, and two other men he knew, take Calloway out of the car; that he had seen petitioner force Calloway to his knees; and he had then seen petitioner shoot Calloway. Quinones picked petitioner out of a photo array and told Det. Sullivan about locations that petitioner frequented and the kind of car he drove (a baby blue Mercedes). According to Det. Sullivan, he and his partner went out looking for petitioner, identified his car in the process of parking in front of the house of his girlfriend, and effected petitioner's arrest. Those detectives were the ones who found the murder weapon on petitioner.

Petitioner firsts contended that his lawyer was ineffective because he did not object to the use of numbers instead of names for Witnesses 1 and 2 at the suppression hearing. Neither New York law nor the Constitution require naming the eyewitnesses on whom an arresting officer relied in connection with a suppression hearing. See United States v. Raddatz, 447 U.S. 667, 679 (1987); United States v. Matlock, 415 U.S. 164, 174-75 (1974) (citing McCrary v. Illinois, 386

U.S. 300, 307-08 (1967)); Erbert v. Goetz, 610 F.3d 404, 414 (7th Cir. 2010); Martinez v. Griffin, No. 19-cv-4252, 2019 WL 4168535, at *2 (E.D.N.Y. Sept. 3, 2019); Wilkerson v. N.Y. State Bd. of Parole, No. 13-cv-3817, 2015 WL 678581, at *19 & n.5 (S.D.N.Y. Feb. 17, 2015). In addition, the first detective's testimony about the fear that Witness 2 had for his safety supported the trial court's finding of a need for witness anonymity at the suppression stage of the case.

Regarding petitioner's claim that his attorney should have further cross-examined the first detective on how he assembled the photo array, that was largely immaterial because both Witness 1 and Witness 2 had known petitioner for so long. See Abdur Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001); Shepard v. Kirpatrick, No. 17-cv-1235, 2021 WL 3111909, at *4 (E.D.N.Y. July 22, 2021); Brown v. Miller, No. 04-cv-9804, 2005 WL 1773683, at *6–*7 (S.D.N.Y. 2005); People v. Rodriguez, 79 N.Y.2d 445, 449–50, 583 N.Y.S.2d 814, 271 (1992). Considering the length of time the witnesses had known petitioner, and the fact that they named him before seeing the photo array, there was no chance of a misidentification. In addition, the photo arrays were not introduced at trial and thus not used to buttress the identifying witnesses' testimony.

Finally, petitioner contended that his counsel was ineffective for not insisting that Witness 1 and Det. Sullivan's partner testify at the suppression hearing. However, there is no right to call witnesses at a suppression hearing; it is a matter of discretion with the hearing judge. See Wells v. Bradt, No.12-cv-4829, 2018 WL 4356721, at *4 (E.D.N.Y. Sept. 12, 2018); Duran v. Miller, 322 F. Supp. 2d 251, 257 (E.D.N.Y. 2004). In addition, petitioner has offered no reason why he was prejudiced by his counsel's failure to demand that the trial court call these witnesses, and the testimony at trial compels the conclusion that he was not.

For these reasons, the Appellate Division's rejection of these arguments was neither contrary to or an unreasonable application of Strickland and its progeny.

**B. Failure to seek dismissal of indictment because it referred to petitioner as "defendant" instead of using his name**

Petitioner argued in his *pro se* appellate brief that his trial counsel was ineffective for failing to move to dismiss the indictment as jurisdictionally insufficient. Petitioner's problem with the indictment is that, although it expressly named him in the caption of the indictment, it referred to him only as "defendant" in each count instead of using his name. He also contended that because of the failure to use his name, he could not distinguish himself from his accomplices and so had inadequate notice of the charges.

The Appellate Division correctly found that petitioner's argument was without merit. First, petitioner was the only party indicted, as the caption reflected, so that when the substance of the indictment referred to the "defendant," it could only have been referring to petitioner, not his accomplices. Second, nothing in N.Y. C.P.L. § 200.50, which specifies the required content of indictments, mandates naming a defendant in every or any count. Third, C.P.L. § 210.25 allows a court to dismiss an indictment only if it does not "substantially conform" to the requirements of § 200.50. Fourth, the cases upon which petitioner relied were merely dictum in an unrelated context, see People v. Bennett, 37 N.Y. 117, 10 Tiffany 117 (1867), contradicted his argument, see People v. Brothers, 66 A.D.2d 954, 411 N.Y.S.2d 714 (3rd Dep't 1978), or were inapposite, see People v. Gannett, 68 A.D.2d 81, 416 N.Y.S.2d 81 (4th Dep't 1978).

Trial counsel was not objectively unreasonable in failing to make a motion that would almost certainly have been denied with good reason. For the same reason, petitioner was not

prejudiced by the failure to make a bizarre motion. The Appellate Division's rejection of the argument was neither contrary to nor an unreasonable application of Strickland and its progeny.[3]

### C. Failure to object to venire not being sworn

The Appellate Division found that the venire was, in fact, sworn, and that ruling has survived habeas review. See section III(A), supra. Therefore, counsel was not ineffective for failing to raise this objection.

### D. Failure to object to the trial court's not stating that petitioner had an "option" to close

In explaining to the jury the procedure that a case follows, the trial judge advised the jury at the outset that although trial counsel might choose to give an opening statement, "the defendant has no obligation to prove anything, obviously, he doesn't have to open … ." Petitioner has no complaint about that instruction. However, regarding closing arguments, the trial court did not re-instruct the jury that petitioner had the option of making a closing argument. It simply said that petitioner's counsel would give the initial closing argument, and the prosecution would go last. The trial court explained:

> Some people may say that is unfair, but it's not unfair at all. The reason we do that is it's another illustration who has the burden of proof, namely the People. That is why the defendant goes first and the district attorney goes second. He, having the burden of proof, we give him the last word in final argument.

Notwithstanding this direction, petitioner contended that his counsel was ineffective for not objecting to the trial court's omission of the "option" language regarding closing arguments. Petitioner reasons that the trial court's instruction improperly shifted the burden of proof to him.

[3] Petitioner also argued that he was denied "equal protection of the law" because District Attorneys in some other counties, unlike Kings County, refer to the defendant by name in each count. This variance in local practice has nothing to do with the equal protection clause.

The point is frivolous. The above-quoted passage was far from the only time that the trial court instructed the jury that the prosecution always had the burden of proof – the transcript is replete with that reminder. The failure to describe the right to close as an "option" did not shift the burden of proof. Trial counsel would have gained nothing by objecting.

**E. Incompetent cross-examination**

On direct examination of Williams, the prosecutor elicited that the witness had a prior conviction by guilty plea for gun possession. In cross-examining Williams, trial counsel asked several questions which demonstrated that the witness was, in fact, very familiar with guns. As part of that, he asked Williams where he had gotten the gun for which he had pled guilty, and Williams replied, perhaps to counsel's surprise, that he had gotten it from petitioner and was holding it for petitioner. Based on that, on redirect, the prosecutor brought out that the witness and petitioner had an argument over the gun and that petitioner wanted the witness to pay for the gun because the police had confiscated it. On re-cross, trial counsel brought out that petitioner had demanded $650 for the gun. He also brought out that the witness had never told the police or anyone else that he had obtained or was holding the gun for petitioner, and that, indeed, the witness had allocuted at his guilty plea that the gun was his.

Petitioner contended that trial counsel's opening of the door to this line of questioning and pursuing it on re-cross "raised a doubt" as to the competency of counsel. He asserted that trial counsel should have interviewed the witness before trial to learn the witness's story that he had gotten the gun from petitioner. "Raising a doubt" is far from the constitutional standard, and, in fact, when the proper standard under AEDPA is applied, the argument must be rejected.

The decision whether to ask a particular question or pursue a particular line of questioning is within the scope of strategic determinations that counsel must make during trial.

"Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)). Asking or not asking specific questions falls outside the range of reasonableness only if they "cannot be explained convincingly as resulting from a sound trial strategy, but instead [arise] from oversight, carelessness, ineptitude, or laziness," Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003).

Even assuming that trial counsel was surprised by Williams' answer about getting the gun from petitioner, that would not mean that counsel was ineffective. See Phyle v. Leapley, 66 F.3d 154, 159 (8th Cir. 1995); 2 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 11.10, at 95 (1984). He recovered quickly and elicited useful information that tended to discredit Williams. First, the fact that the witness had allegedly "taken a fall" for petitioner on an unrelated gun charge a year earlier showed bias of the witness against petitioner and a possible retaliatory motive for his testimony. Second, if one accepts the witness's testimony at trial, the witness admitted not only failing to inform the police (and presumably the prosecutor in this case) about where he had gotten the gun, but had also lied to a court under oath when giving his guilty plea by accepting sole ownership of the gun rather than having a mere bailment. Third, by demonstrating how familiar the witness was with the exact kind of gun at issue in the case, trial counsel also demonstrated that it would be easy for the witness to fabricate his claim that petitioner had held the particular gun rather than the witness. One could reasonably disagree with any of these rationales, but the possibility of reasonable disagreement itself means trial counsel was not objectively unreasonable in pursuing the line of questioning.

As to the claim that petitioner should have interviewed Williams before trial, petitioner offered no reason why a prosecution witness would volunteer for such an interview or, if he strangely had, disclosed to trial counsel the substance of his testimony on an unrelated gun charge a year before the events at issue in the case.

Finally, petitioner argues that his trial counsel was ineffective for not requesting a limiting instruction about the prior gun transaction between Williams and him. I presume that petitioner is asserting that the limiting instruction would have said that the prior transaction only went to the credibility of Williams and was not evidence that petitioner had committed the charged crimes. Such an instruction would have been proper, but its absence does not meet the heavy burden of showing ineffective assistance, especially considering the overwhelming evidence against petitioner. See Jones v. Smith, No. 09-cv-6497, 2011 WL 7794174, at *5 (S.D.N.Y. Nov. 4, 2011) ("Where the evidence of petitioner's guilt is overwhelming, an ineffective assistance claim predicated on counsel's failure to request a limiting instruction falters on Strickland's prejudice prong." (Citing Berghuis v. Thompkins, 560 U.S. 370, 389–91 (2010))).

The Appellate Division's decision that trial counsel was not ineffective was therefore neither contrary to nor an unreasonable application of Strickland and its progeny.

**F. Failure to object to testimony of the pathologist**

Petitioner argues that the pathologist who testified went beyond the scope of what the trial court said it would allow. Petitioner has mischaracterized what the trial court said. The trial court was concerned that the pathology report might have hearsay within hearsay, and he directed the attorneys to confer and redact such information provided by third parties, if there

was any, which they did, and the report was admitted without objection. (The record does not disclose whether the parties had to redact any hearsay within hearsay.)

At no time did the trial court restrict the pathologist's ability to offer opinions as an expert. He was thoroughly qualified, and the trial court recognized him as an expert in the field of pathology. Petitioner complains that the pathologist offered his "personal" opinions, but that is what an expert does. The opinions as to cause of death were firmly based in the pathology report and the other evidence admitted at trial. An objection from trial counsel would have been futile and therefore trial counsel was not ineffective for refraining from futile objections.

**G. Failure to object to a report showing that the gun was operational**

Through the testimony of a detective, the prosecutor sought to introduce a copy of a ballistic report showing that the Glock 9mm seized from petitioner at the time of his arrest was operable, *i.e.*, capable of firing live ammunition. The detective, after being qualified as an expert in ballistics, testified that the report was prepared in the regular course of the NYPD ballistics unit's activities. It also contained a sworn statement by the detective who performed the ballistic test (who was not the detective testifying) that the report was a true and full copy of the original. Petitioner's trial counsel did not object to the admission of the report.

Petitioner contended that the failure to object was ineffective assistance because the admission of the report violated his right to confront the detective who had in fact tested the firearm. He relies on cases like Crawford v. Washington, 541 U.S. 36 (2004), and Melendez-Dias v. Massachusetts, 567 U.S. 305 (2009). However, these cases were decided more than a decade after petitioner's conviction.

A lawyer is not ineffective because he fails to anticipate future changes in the law. See Sanchez v. Lee, No. 10-cv-7719, 2011 WL 924589, at *32 (S.D.N.Y. March 16, 2011) ("The

Sixth Amendment does not require counsel to presage changes in the law."), report and recommendation adopted, 2011 WL 3477314 (S.D.N.Y. Aug. 8, 2011), aff'd, 508 F. App'x 48 (2d Cir. 2013). Rather, ineffective assistance claims must be evaluated based on the law as it existed at the time the lawyer made the decision in question. Strickland, 466 U.S. at 689 (counsel's effectiveness must be measured "from counsel's perspective at the time"); Jameson v. Coughlin, 22 F.3d 427, 429 (2d Cir. 1994) ("[C]ounsel [cannot] be deemed incompetent for failing to predict that the New York Court of Appeals would later overrule the Second Department's reasonable interpretation of New York law"); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) ("Counsel is not required to forecast changes in the governing law.").

Here, trial counsel's decision not to object was squarely in line with the law on the Confrontation Clause then existing under Ohio v. Roberts, 448 U.S. 56 (1980), overruled, Crawford v. Washington, 541 U.S. 36 (2004). Crawford did not overrule Roberts until eleven years after petitioner's trial and Melendez-Diaz was decided sixteen years after petitioner's trial. It was not objectively unreasonable for trial counsel to refrain from objecting at the time of trial and counsel was not ineffective for acting in accordance with the law at that time.

Petitioner also contended that the report was not properly authenticated as a business record. But, notably, after the witness started to give the business records testimony, the parties had an off-the-record conference with the trial court and it was only then that petitioner's counsel determined not to object. It was well within the scope of strategic decisions allocated to trial counsel to not insist on the formulaic representation of the entire foundational testimony that would have been elicited in any event.

Finally, this argument about the operability report is a red herring. The report merely confirmed the obvious inference from the other evidence. The testifying detective was the one

who performed the ballistics test and he confirmed that the bullets found in Calloway's head and the ones used in the operability test were fired from the subject gun seized from petitioner – that, again, was according to his own ballistics testing, not the operability test that another detective had performed. The jury could not have reached any other conclusion but that the gun had been operable when petitioner shot Calloway because there was no other way to get matching bullets in Calloway's head by an operable firearm.

**H. Failure to object to rebuttal testimony**

During the defense's case, petitioner called a witness, Gina Williams (not related to the prosecution's witness, Billy Williams), who testified that although she knew petitioner and his mother from around the neighborhood, she did not socialize with them. Williams then testified that on the night in question, she saw "three guys" carrying guns pass her on the street. Williams saw one of the guys take a person outside of the car, and then heard shots. She testified that she had gotten a good look at these three guys, and petitioner was not one of them.

Williams also testified that she had spoken to no one about what she saw except one person who was also present at the time named "Boo."[4] On cross-examination, she testified that she did not even know petitioner had been arrested until his mother told her, and that occurred four days prior to the trial. When asked the last time she saw petitioner, she testified, "I haven't seen him in awhile because he is not a hang out partner for me." She thus presented herself as a disinterested witness who had no motive to fabricate.

In the event, Williams was lying. The prosecutor called a rebuttal witness to show that Williams was biased and interested and that her testimony was false. The rebuttal witness was a

[4] The surviving car occupants who testified at trial also acknowledged seeing Boo before Calloway was removed from the car.

security officer at Rikers Island who testified that according to the visiting records on Rikers Island, Williams had visited petitioner on Rikers Island less than two months before the trial started. Moreover, she was not alone. Petitioner had called another witness at trial, his former girlfriend and mother of his child, to say that she was with petitioner when he was arrested, and she didn't see him with a gun nor did she see the detectives remove a gun. The Rikers Island visiting log showed that both women had visited petitioner together.

Petitioner argues that his trial counsel was ineffective for not objecting to the prosecution's rebuttal witness. The transcript discloses that he is wrong. When the trial court ruled that the rebuttal witness could testify, it recited several grounds on which trial counsel was objecting. The trial court overruled those objections, and trial counsel stated: "I take a very strong exception."

In any event, even if trial counsel had not objected, the admission of the evidence would have been proper. The Appellate Division's decision was therefore neither contrary to nor an unreasonable application of any Supreme Court authority.

**I. Sufficiency of the evidence**

In his *pro se* brief, petitioner raised a two-pronged claim asserting that, first, his counsel was ineffective for not making a motion to dismiss for insufficient evidence at the close of the prosecution's case, and, second, that the evidence was in fact legally insufficient. The Appellate Division disposed of the first part of the claim by expressly rejecting the second part on the merits: "In any event, viewing the evidence in the light most favorable to the prosecution, [the evidence] was legally sufficient to establish the defendant's guilt on those counts beyond a reasonable doubt." Cobb, 77 A.D.3d at 674, 908 N.Y.S.2d at 449. This effectively resolved the

ineffective assistance claim as to this point because petitioner could not have been prejudiced by his counsel's failure to make a dismissal motion if the evidence was legally sufficient.

It was, and then some. The standard for reviewing claims of legal insufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Thus, even when "faced with a record of historical facts that supports conflicting inferences, [the habeas court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Relief on a sufficiency claim cannot be granted unless the record is "so totally devoid of evidentiary support that a due process issue is raised." Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) (internal quotation marks omitted).

Two witnesses identified petitioner as one of the group who escorted Calloway away from the car at gunpoint. Those same witnesses testified to the robbery of the car keys, and one of them heard the two gunshots. The other found the body shortly thereafter. Petitioner was arrested carrying the murder weapon a week later. No lawyer could have made a straight-faced argument of legal insufficiency. The Appellate Division's decision was neither contrary to nor an unreasonable application of Jackson.

**J. Trial court's alleged undue interference with the trial**

Petitioner argues that the trial court deprived him of a fair trial by interjecting itself into the questioning and brought out information supporting the prosecution's case. Having read the entire trial transcript, I cannot find that the Appellate Division's rejection of this point was contrary to or an unreasonable application of any Supreme Court authority. All the transcript

shows is that the trial judge interjected himself from time to time for the same reason many judges interject themselves at trial – to clarify and expedite. As the Second Circuit observed in Daye v. Attorney General, 712 F.2d 1566, 1572 (2d Cir. 1983) (*en banc*):

> A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits.

Thus, a state trial judge would have to engage in conduct that was "significantly adverse to the defendant" before it violated the defendant's right to due process which would in turn permit federal judicial intervention. Garcia v. Warden, 795 F.2d 5, 8 (2d Cir. 1986); see also Gayle v. Scully, 779 F.2d 802, 811 (2d Cir. 1985) (state trial court has the "right, indeed frequently even the duty" to intervene at trial "in an effort to clarify and to avoid confusion"). Petitioner suffered no prejudice from the conduct of the trial court.

## V. Claims raised in petitioner's first (represented) motion under C.P.L. § 440.10

Prior to the perfection and determination of his direct appeal, petitioner, through counsel, brought a motion to vacate the judgment pursuant to N.Y. C.P.L. § 440.10. The motion came before the same judge who had tried the case. The motion had three grounds, one for the alleged failure to produce documents under Brady v. Maryland, 373 U.S. 83 (1963); one for alleged false witness testimony before the grand jury that indicted him; and one for ineffective assistance of counsel. Each is discussed below, but none are sufficient to require habeas corpus relief under the AEDPA standard discussed above.

### A. Failure to turn over Brady material

Petitioner asserted in his first § 440 motion that there were two documents that the District Attorney was required to produce before trial under Brady, but had not. Petitioner contended that these documents undermined the prosecution's contention that 9mm shell

fragments removed from Calloway's head and a shell casing found at the crime scene matched the gun carried by petitioner at the time of his arrest.

The first document was a report by the Emergency Services Unit that had arrived on scene to try to treat Calloway. The report showed that ESU had not retrieved any ballistic evidence from the crime scene. Petitioner contended that this impeached the trial testimony of a witness, Police Officer Cade, who testified at trial that he had found a spent shell casing at the scene.

The second document was a receipt for autopsy evidence from the Medical Examiner's office. The report opined that the bullet fragments removed from Calloway's head were from a .38 caliber handgun. The police ballistics expert who testified at trial, Det. Thomas Natale, had opined that the fragments were from a 9 mm handgun.

The § 440 court rejected petitioner's arguments on numerous grounds. One of these was that petitioner failed to show that the prosecution had not produced these documents. It also held that petitioner had simply misread and cherrypicked the record, and that these documents would not have materially affected the prosecution's case.

As to the ESU report, the § 440 court found that the record showed that Officer Cade, who had arrived on-scene before ESU, had removed and vouchered the shell casing while ESU was checking over Calloway. Officer Cade testified that, once he saw the shell casing, "since EMS were around him, kneeling down and stepping on the grass, I thought it would be a good idea to pick it up." Officer Cade further testified that he had vouchered the shell casing and sent it for ballistic examination. That is why ESU didn't find the shell casing.

As to the autopsy report, Det. Natale testified at trial that because of the degraded nature of the fragments found in Calloway's head, it was impossible to determine whether the

fragments came from a 9mm or .38 caliber handgun without matching the fragments to the gun that fired them by microscopic examination. The Medical Examiner did not have the handgun when he did the autopsy, only bullet fragments, but Det. Natale did. He matched them using a microscope, and that was how he knew the fragments were from a 9mm handgun, the same handgun found on petitioner at the time of his arrest, not a .38 caliber gun.

Because the § 440 court denied this claim on the merits, my review is constrained by the AEDPA standard described in detail above.

The prosecution's responsibility under Brady is clear: "To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." Leka v. Portuondo, 257 F.3d 89, 98 (2d Cir. 2001) (quoting United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998)). There are three components to a Brady violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). Evidence is "material" when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." U.S. v. Bagley, 473 U.S. 667, 682 (1985).

Putting aside the § 440 court's finding that petitioner had failed to prove that the prosecution had not turned over the ESU report or the autopsy receipt (and there was evidence to suggest that the prosecution had in fact turned over these documents), the § 440 court's holding that this evidence was not material is not contrary to or an unreasonable application of Brady or its progeny. The ESU report had no impeachment value; Officer Cade's testimony that he

retrieved and vouchered the shell casing resolved any arguable inconsistency. The autopsy report might have had some minor impeachment value, but considering that the Medical Examiner is not a ballistics expert, and that Det. Natale testified that the caliber of the murder weapon could not be determined from the fragments without testing against the murder weapon and performing a microscopic evaluation, any impeachment value was minor.

This evidence does not undermine confidence in the outcome of the verdict. Petitioner's argument is therefore rejected.

### B. False grand jury testimony

Quinones had testified before the grand jury that he saw petitioner arrive at the scene of the crime in a "baby blue Mercedes," exit the vehicle, and shoot Calloway. Quinones did not testify at trial. However, official public records in the possession of the prosecutor and defense counsel showed that at the time of the shooting, authorities in Virginia had impounded petitioner's blue Mercedes. Petitioner therefore contended that the indictment had been based on perjured evidence. From there, he further contended that the prosecutor had engaged in prosecutorial misconduct, and that his defense counsel was constitutionally ineffective for not seeking to dismiss the indictment on the basis of perjured testimony. The § 440 court rejected this argument on three grounds, two of them substantive.[5] For the same reason noted above,[6] this Court will review the substantive grounds under AEDPA's deferential standard.

---

[5] The procedural ground was that under New York law, false grand jury testimony cannot constitute grounds to vacate a conviction under C.P.L. § 440.10 when the conviction before a petit jury is based upon legally sufficient evidence. See C.P.L. § 210.30(6). Federal habeas corpus procedure applies an even broader exception following petit jury convictions for the same reason, see United States v. Mechanik, 475 U.S. 66 (1986), but because petitioner claims that his trial counsel was ineffective for not moving to dismiss on that ground, this Court will consider his challenge on the merits. Cf. Davila v. Davis, 137 S. Ct. 2058, 2062 (2017) ("Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear" unless the prisoner "can establish 'cause,'" including attorney that amounts to "constitutionally ineffective assistance of counsel.").

[6] See fn. 2, supra.

First, the § 440 court observed that petitioner was not the only owner of a blue Mercedes in the world, and the prosecutor had never contended before the grand jury or at trial that the blue Mercedes in which petitioner was riding on the day of the crime belonged to him. In support of this conclusion, the § 440 court pointed out that one of petitioner's own witness had testified that petitioner arrived at her house that day as a passenger in a blue Mercedes belonging to another person named Lee. The § 440 court therefore concluded that petitioner had failed to prove that Quinones' testimony before the grand jury was false.

Second, the § 440 court noted that even without Quinones' testimony, there was sufficient evidence to support the indictment. It observed that witness Neal (recall that he was in the car when petitioner and his accomplices removed Calloway) testified before the grand jury and at trial, and his trial testimony was that he saw petitioner hold a gun to Calloway's head; take Calloway over to the murder scene; and heard shots shortly thereafter. Although petitioner had not submitted the transcript of the grand jury proceedings with his motion, the § 440 court held that if Neal testified substantially the same before the grand jury as he later did at trial – and petitioner had offered no evidence to the contrary – Quinones' testimony was not required for the grand jury to hand down its indictment.

Either one of these grounds is sufficient under AEDPA to withstand review. Petitioner failed to establish that Quinones had given any false testimony, and even if he had, the grand jury had sufficient evidence from Neal so that it would have handed down the indictment even without Quinones's testimony. At the very least, "fair minded jurists" could disagree as to the § 440 court's conclusions, and that by itself requires rejection of petitioner's argument. See Harrington, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").

### C. Ineffective assistance of trial counsel

Petitioner raised a number of ineffective assistance claims in his § 440 motion, all of which the § 440 court rejected on the merits (and some on procedural grounds as well). Having previously explained petitioner's double-burden under Strickland and AEDPA in connection with petitioner's direct appeal, see section III(D), supra, the Court will not repeat that discussion here. Once again, petitioner is unable to overcome this burden.

#### 1. Failing to cross-examine prosecution witnesses using the ESU report and the autopsy receipt

Petitioner contended that his trial counsel was ineffective for failing to use the ESU report and the autopsy receipt (see section V(A), supra) to impeach the prosecution's ballistic evidence. This Court has already upheld the § 440 court's decision that these documents were not Brady material and that petitioner had not proven that his trial counsel did not have them. Assuming that trial counsel had them but chose not to use them, the § 440 court held:

> Since, as noted earlier, the emergency service report shows that the search by the emergency services unit took place after Officer Cade found the shell by the victim's head, defense counsel would have had no reason to use the emergency service report on cross-examination. Likewise, since the ballistics expert testified that he was not able to tell if the bullet removed from Calloway's body was a .38 caliber or 9 millimeter bullet until after he conducted the microscopic examination, counsel would have had no reason to use the autopsy receipt which was prepared before the microscopic comparison.

This holding does not warrant relief under the Strickland/AEDPA standard. Counsel's decision not to use these documents for cross-examination was fully within his discretion, nor was petitioner prejudiced by the decision as the documents had little or no impeachment value.

**2. Failure to request a circumstantial evidence charge**

Under New York law, when the prosecution's case is based exclusively on circumstantial evidence, the trial court is required to give a jury instruction that "the circumstantial facts proved must exclude to a moral certainly every hypothesis but guilt." See People v. Ford, 66 N.Y.2d 428, 433, 497 N.Y.S.2d 637 (1985); People v. Mickewitz, 236 A.D.2d 793, 654 N.Y.S.2d 221 (4th Dep't 1997) (quoting 1CJI[NY] 9.05 at 475). However, if there is any direct evidence tending to show the defendant's guilt, then the trial court need not give the instruction. See People v. Sanchez, 92 A.D.2d 595, 459 N.Y.S.2d 488 (2d Dep't 1983). Petitioner contended in his § 440 motion that his trial counsel was constitutionally ineffective for not requesting such an instruction.

The § 440 court rejected this argument on the merits. Although it found that it would have given a circumstantial evidence instruction had counsel requested it, it also found that counsel could have had a sound strategic reason for not requesting the charge:

> In order to explain the application of the circumstantial evidence charge to the facts of the case, the court would also have been obligated to marshal the evidence to some degree. Given the extensive circumstantial evidence showing defendant's involvement in the shooting, defense counsel may reasonably have felt that even the fairest marshaling by the court would have unduly highlighted the strength of the People's case. Defense counsel may also have felt that a circumstantial evidence charge would have distracted the jury from the issue of witness credibility which he emphasized in his summation. Moreover, even if counsel had objected to the lack of a circumstantial evidence charge and the court refused to give the charge, an appellate court could have found the error harmless given the strength of the People's case.

(citations omitted).

This is solid reasoning that does not run afoul of Strickland or AEDPA. The § 440 court's holding that there could have been a good strategic reason for counsel's

decision not to request the instruction is the equivalent of stating that counsel's decision was not objectively unreasonable. Not wanting to hear the trial court summarize the prosecution's evidence for the jury as part of the instruction was very likely the wisest choice to make, and certainly within the range of trial counsel's discretion under Strickland. See Santos v. Greiner, No. 99-cv-1545, 1999 WL 756473, at *28–*30 (S.D.N.Y. Sept. 24, 1999) (collecting cases).

The § 440 court's alternative "harmless error" holding can be viewed in two ways, either one of which is sufficient to preclude habeas corpus relief. First, that holding is the equivalent of stating that the evidence was sufficient to a moral certainty to exclude any hypothesis of innocence. See People v. Fuentes, 290 A.D.2d 563, 564, 737 N.Y.S.2d 106, 107–08 (2d Dep't 2002) ("the denial of the circumstantial evidence charge was harmless" because "[t]he circumstantial evidence adduced at trial overwhelmingly established the defendant's guilt of the crimes of which he was convicted and excluded to a moral certainty every hypothesis consistent with innocence."). In addition, a holding of harmless error in this context is also the same as finding that petitioner was not prejudiced and thus did not satisfy the second prong of Strickland. Cf. Brinkley v. Lefevre, 621 F.2d 45, 47 (2d Cir. 1980) ("Since the failure to give a Bruton-type instruction regarding [the co-defendant's] admissions would be harmless error, the failure to request it was hardly ineffective assistance."). Under either reading, petitioner is not entitled to relief.

Moreover, the § 440 court indulged petitioner more than necessary in assuming that the prosecution's case here was exclusively circumstantial. Both witnesses testified that petitioner took Calloway out of the car at gunpoint and one heard shots minutes

thereafter. A shell casing found at the scene and bullet fragments from Calloway's head matched the 9mm handgun found on petitioner at the time of arrest. To characterize this evidence as "exclusively" circumstantial is likely an overstatement, and if it was not viewed as exclusively circumstantial, New York law does not require a circumstantial evidence instruction. See Sanchez, 92 A.D.2d 595, 459 N.Y.S.2d 488. There was direct evidence on every point in the story of Calloway's murder except the actual pulling of the trigger, and the § 440 court's characterization was more generous to petitioner than it had to be.

**3. Trial court's handling of jury notes**

This is the same point that petitioner later raised on direct appeal, see section III(E), supra, except that in petitioner's § 440 motion, it was characterized as ineffective assistance for counsel's failure to object to the manner in which the trial court dealt with jury notes. The § 440 court rejected the merits of the claim on several grounds. One of them was that, although it did not appear in the record (and apparently in the judge's recollection), based on the evidence of how the court handled other jury notes, "the court may have followed the same procedures regarding the notes at issue." That is, the trial court would have shown the notes to counsel, allowed the prosecutor and defense attorney to agree on the readback, and then read or provided the agreed testimony to the jury. "Consequently," the § 440 reasoned, "trial counsel may have chosen not to object because the court's procedures allowed him meaningful input with regard to the jury notes . . ." .

This Court has already considered the later decision by the Appellate Division to reject petitioner's substantive point that the trial court did not properly deal with the jury notes. See section III(E), supra. Since the substantive point failed, it follows that it could not be ineffective

assistance for counsel not to object to the procedure, as such an objection would have been pointless.

Thus, there are effectively two state court decisions on the merits that reject this point, one by the § 440 court and the later decision by the Appellate Division. Neither of these rulings was contrary to or an unreasonable application of any Supreme Court decision.

**4. Failure to object to the release of a juror**

Prior to beginning jury selection, defense counsel advised the trial court that he had obtained petitioner's permission to decide whether to strike or allow each venire person. After nine jurors were selected, one of them stated that "I really don't care to do this. I don't like the whole idea." Following an off-the-record discussion, the juror stated that "I was on a very involved rape case." The trial court then excluded the juror.

Petitioner contended in his § 440 motion that his attorney should have consulted with him before determining not to object to the release of that juror. The § 440 court rejected the argument on the merits, both because the record showed, at least circumstantially (counsel's statement), that petitioner had consented to his counsel making these decisions, and also because even without regard to petitioner's permission, the decision whether to object to the dismissal of prospective jurors is within the tactical discretion of trial counsel.

The § 440 court's reasoning and conclusion not only withstands review under Strickland and AEDPA, but the point is, and always has been, frivolous. If petitioner really wanted to have someone on his jury who was not only very unhappy to be on the jury but who also had a bad experience being a juror in a prior serious felony case, he would have been virtually unique among defendants. Conventional wisdom would have been flouted, to say the least, had trial counsel fought to keep this juror. Indeed, had trial counsel objected to the discharge and

persuaded the trial court to keep that juror despite the juror's hostility, petitioner would have a much stronger ineffective assistance claim than the one he has made, although even there, the broad tactical discretion of trial counsel in selecting a jury would likely have insulated trial counsel's decision. See generally Strickland, 466 U.S. at 690–91 (decisions regarding trial strategy are "virtually unchallengeable.").

In any event, the § 440 court's conclusion that petitioner failed to satisfy Strickland on this point was correct, and there is thus no basis for this Court to disagree viewed through the prism of AEDPA. At the very least, petitioner did not show that he was prejudiced by counsel's decision because petitioner did not challenge the fairness of the jury as seated. Cf. Krasniqi v. United States, 195 F. Supp. 3d 621, 638 (S.D.N.Y. 2016) ("[Petitioners have] not – and cannot – show [prejudice because they failed to demonstrate] that the composition of the jury would have been different . . . or that there is a reasonable probability that the result of the proceeding would have been different.").

## VI. Claims raised in petitioner's second motion (*pro se*) under C.P.L. § 440.10[7]

Petitioner made his second § 440 motion after the decision on his direct appeal became final. It again asserted multiple arguments of ineffective assistance of trial counsel. Some of these arguments were raised for the first time in his reply papers. Some of his arguments were repeats of those that had been raised in his first § 440 motion. Others were arguments that had been raised on direct appeal or positions the state courts had substantively rejected, but petitioner raised again in the form of ineffective assistance claims.

[7] Petitioner's filings in this Court is unclear as to whether he is raising some or all of the claims that he raised in his second § 440 motion. The Court will assume the latter.

The § 440 court (second motion) invoked a panoply of grounds to procedurally bar petitioner's arguments. But it also held in the alternative, albeit summarily, that all the arguments were without merit. See Harrington, 562 U.S. at 99 (requiring a federal habeas court to presume that an unexplained summary affirmance adjudicated the merits of any federal claim presented to the state court). I will therefore not parse through the various possible procedural bars under New York law but again proceed to the merits of each claim applying the AEDPA standard of review. Cf. Van Buskirk v. Baldwin, 265 F.3d 1080, 1083 (9th Cir. 2001) (court may properly deny petition on merits rather than reaching "the complex questions lurking in the time bar of the AEDPA.").

**A. Failure to convey plea offer made during trial and failure to advise on sentencing exposure**

Petitioner contended that during jury deliberations, the prosecution made his attorney a plea offer of 20 years to life but that his attorney never conveyed it to him. He also contended that his attorney never advised him that he could face consecutive sentences.

In evaluating these claims, this Court is keenly aware, as was the § 440 court, that petitioner did not raise these arguments until nearly 20 years after his conviction. As suggested above, and by the fact that this Court is reviewing a 1993 conviction in 2022, the history of this case is beyond tortured. Most of the delay was due to petitioner's taking years to perfect his direct appeal. That included an Article 78 proceeding to obtain documents under New York's Freedom of Information Law that he said he needed to do his direct appeal, which he lost. After a series of deadlines for his direct appeal came and went, the Appellate Division dismissed the appeal as abandoned. And, also as noted above, it took several years after that for petitioner to get his first federal habeas corpus petition granted so that his direct appeal to the Appellate Division could be reinstated. That brought him back to the point of finally perfecting his direct

appeal, and his conviction wasn't affirmed by the Appellate Division until late 2010. Add to that his second § 440 motion that wasn't denied until 2012, and his Combined Motion, the denial of which wasn't filed until 2014, and the math shows that the proceedings in the state court took more than 20 years to conclude.[8]

Aside from being remarkable and unfortunate, the lengthy delay before petitioner's second § 440 motion was finally determined in 2014 had an impact on those proceedings and that impact carries forward to his request for habeas corpus relief. The claim raised in those proceedings that petitioner is reprising here involve events that occurred so far in the past that recollections of the participants are not likely to be specific. Petitioner, unsurprisingly, professes a firm recollection of what he claims his trial attorney told him and didn't tell him. Also unsurprisingly, his former trial counsel and the ADA who prosecuted petitioner, in opposing the § 440 motion, could not remember the specifics of what happened in this one case more than 20 years before.

However, as to petitioner's claim of a plea offer during deliberations, both his former trial counsel and the prosecutor submitted affidavits stating it could not have happened, both as a matter of their general practices and as a matter of policy of the District Attorney's Office. Petitioner's evidence of such a plea offer consists of a handwritten notation on the prosecutor's case file which the prosecutor originally misread as occurring in June, 1992, but the prosecutor corrected that and averred that it was January, 1992, well before the trial. Petitioner argues that the prosecutor is dissembling about that correction, but having looked at the notation on the file, it is easy to see the prosecutor's mistake. In addition, there is the commonsense point that there

[8] The delay between 2014 and now is the responsibility of this Court, although briefing before my predecessor judge was not completed until 2016, and the case was not reassigned to me until last year.

would be no reason for trial counsel not to have conveyed such an offer to petitioner, especially considering the overwhelming evidence against him.

As to whether counsel advised petitioner that he could get consecutive sentences, petitioner's own actions refute that argument. He was sentenced to consecutive sentences in 1993. He obviously knew he had received consecutive sentences. He thereafter filed his first § 440 motion, and his direct appeal, including numerous claims of ineffective assistance as discussed above, followed by numerous motions for rehearing and reargument, but at no time until 20 years after his conviction did he raise this point that his counsel had not advised him that he could be sentenced consecutively. The sophistication of petitioner's *pro se* submissions shows he left no stone unturned, legally or factually, in attacking his conviction, especially when it came to claims of ineffective assistance. Petitioner would not have allowed such a glaring omission in his many, many submissions over a 20-year period.

The § 440 court indirectly acknowledged this. It noted: "It has been approximately twenty years since defendant's conviction," recognizing the prejudice that the prosecution had suffered by petitioner's having waited so long to raise these claims. In rejecting the claims on the merits, the § 440 court's holding did not contravene any Supreme Court authority.

**B. Conflict of Interest**

Until the Appellate Division dismissed his initial appeal as abandoned after ten years of failing to perfect it, petitioner was represented by retained counsel James Kousouros, Esq. The record shows that the reason for the lengthy delay was that petitioner refused to sign off on the draft brief. Attorney Kousouros did, however, file petitioner's first § 440 motion. In his second § 440 motion, petitioner summarily asserted that Attorney Kousouros had a conflict of interest, apparently because there was a referral relationship of some sort between Attorney Kousouros

and petitioner's trial attorney. Petitioner offered no argument about how this created a conflict or how he was prejudiced by this relationship, let alone whether he knew of it when he retained Attorney Kousouros. The § 440 court did not misapply any Supreme Court authority in rejecting this factually and legally unsupported claim.

### C. Failure to protect petitioner's right to be present at sidebar during a pretrial hearing

As noted above, on his direct appeal, petitioner had raised an argument about not being present at sidebar during trial. With the Appellate Division finding that he had signed a waiver of that right, his second § 440 motion reframed that argument – petitioner contended that his counsel deprived him of the right to be present at sidebar during his pre-trial suppression hearing. He contended that there was an off-the-record conversation at sidebar between both lawyers and the hearing court concerning the blue Mercedes. He asserted that had he been present at that sidebar, he would have been able to contribute the fact that his blue Mercedes had been impounded. The § 440 court summarily rejected this claim on the merits (among other reasons).

There are several reasons not to disturb the § 440 court's summary rejection of this claim, but the main one is that petitioner's counsel made a deliberate strategic determination not to pursue the line of questioning involving the blue Mercedes.

After a detective testified on direct examination that Quinones had told him that petitioner owned a blue Mercedes, petitioner's counsel, on cross-examination, started to inquire about the car. Counsel elicited from the detective that Quinones had said that he saw petitioner driving the car that day, and that the detective "believed" it was the same model and make described by Quinones. Petitioner's counsel then asked, "What did [Quinones] tell you Mr. Cobb was doing with the Mercedes Benz on May 3, 1991?" It was at that point that the off-the-record sidebar occurred, and when the case resumed on the record, petitioner's counsel stated:

"Your Honor, based on the bench conference, I think it's appropriate for me to withdraw that particular line of questioning."

It is now nearly 20 years since petitioner's conviction. Neither this Court, nor the § 440 court in 2012, nearly ten years after petitioner's conviction, could know with any certainty why defense counsel determined to refrain from further questioning about the blue Mercedes after conferring with the hearing court and the prosecutor. Most likely, it was because the trial court or the prosecutor reminded him that if he asked the detective what Quinones had said, the detective would testify that Quinones told him that he saw petitioner shoot Callaway, as Quinones testified before the grand jury (but not at trial).

But whatever the reason for the withdrawal of the question, counsel's statement on the record makes it clear that he had a purpose and that his decision was strategic. The decision was clearly not casually made. And there is no reason to believe that defense counsel declined to pursue information that would have helped petitioner prevail at the pretrial hearings. Strickland defers to defense attorneys on strategic matters, and the presumption in favor of competent representation, see Michel v. Louisiana, 350 U.S. 91, 101 (1955), is sufficient for this Court to find that the § 440 court's rejection of the argument on the merits was not contrary to or an unreasonable application of Strickland.

In addition, the blue Mercedes was irrelevant to this hearing. The issues at the hearing were, first, whether the police had followed proper identification protocol in conducting the photo array reviews and lineups that led them to petitioner, and, second, whether the police had probable cause to arrest him. If Quinones was not telling the police the truth when he said he saw petitioner driving a blue Mercedes, that would not have rendered the photo arrays and

lineups constitutionally infirm nor would it affect the probable cause calculation. Quinones's credibility was not in issue at the pretrial hearings.

For these reasons, the § 440 court's disposition of petitioner's argument was not contrary to or an unreasonable application of Strickland.

**CONCLUSION**

The petition for a writ of habeas corpus is denied and the case is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. See 28 U.S.C. § 2253(c)(2). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purposes of any appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

Digitally signed by Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
March 27, 2022